# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RC SOONER HOLDINGS, LLC, et al.,[1] | ) | Case No. 10-10528( ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## AFFIDAVIT OF DANIEL GORDON IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Daniel Gordon, being duly sworn, states that the following is true to the best of his knowledge, information and belief:

1.     I am the Sole Manager of RC Sooner Holdings, LLC ("RC Sooner" or the "Company"), a limited liability company organized under the laws of the State of Delaware and the ultimate parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively with RC Sooner, the "Debtors"). I am also the President of AllStar Capital, Inc., which is the sole member of RC Sooner. I am authorized to submit this affidavit (the "Affidavit") in support of the Debtors' chapter 11 petitions and the first day pleadings described herein.[2]

2.     I am familiar with the Debtors' day-to-day operations and business affairs and am generally familiar with their books and records.

---

[1]     The Debtors and the last four digits of their taxpayer identification numbers are: RC Sooner Holdings, LLC (7904); RC Brixton Square Owner, LLC (8002); RC Cedar Crest Owner, LLC (7914); RC Fulton Plaza Owner, LLC (8011); RC Magnolia Owner, LLC (7998); RC Pomeroy Park Owner, LLC (7939); RC Salida Owner, LLC (7947); RC Savannah South Owner, LLC (7983); RC Southern Hills Owner, LLC (7958); Brixton Square Apartments, LLC (1844); CC Apartments, LLC (1798); Fulton Plaza Apartments, LLC (4344); Magnolia Manor Apartments, LLC (4486); Pomeroy Park Apartments, LLC (1649); Salida Apartments, LLC (1915); Savannah South Apartments, LLC (8586); and Southern Hills Villa Apartments, LLC (1721). The business address for each of the Debtors where notices should be sent is 1515 Broadway, 11th Floor, New York, New York 10036-8901.

[2]     Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion (as defined below).

3.     On the date this Affidavit has been filed (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). The Debtors continue in the possession of their properties and in the management of their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In order to enable the Debtors to operate effectively and to mitigate any adverse effects of the chapter 11 filings, the Debtors are requesting various types of relief in applications and motions (the "First Day Motions") and proposed orders filed with the Court on the Petition Date.

4.     Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Affidavit describes the Debtors' history, business and the circumstances surrounding the filing of the Debtors' chapter 11 petitions. Part II sets forth the relevant facts in support of the Debtors' various motions and papers intended to be presented on the first day of these cases. Part III sets forth the relevant facts in support of the Debtors' various motions and papers that either have been filed contemporaneous with the Debtors' chapter 11 petitions, or will be filed shortly thereafter, and which the Debtors would request be heard at a later date.

## I.     Background

**A.     The Debtors' Business and Debt Structure**

6.     The Debtors own, operate and maintain a portfolio of 796 multi-family residential units divided among eight (8) separate apartment complexes (collectively, the

"Apartments") for lease in Tulsa, Oklahoma. The Debtors coordinate the day-to-day operation of their business through RC Realty Management, Inc. ("RC Realty"), a non-debtor affiliate of RC Sooner that provides property management services for the Apartments in exchange for a management fee of four percent (4%) of the Company's gross income. All property management services are provided to the Debtors by employees of RC Realty; the Debtors have no employees of their own.

7.      As set forth in the organizational chart attached as <u>Exhibit A</u> hereto, RC Sooner is the direct parent of eight (8) Oklahoma limited liability companies (collectively, the RC LLCs")[3] that were formed in October 2009 for the purpose of acquiring 100% of the membership interests of eight (8) existing Oklahoma limited liability companies that own the Apartments (collectively, the "Apartment LLCs"[4]). RC Sooner is the sole member of each of the RC LLCs, which are in turn the sole members of each of the respective Apartment LLCs.

8.      Each of the Apartment complexes are subject to and encumbered by loans and real estate mortgages (collectively, the "Loans and Mortgages") currently held by the Federal National Mortgage Association ("Fannie Mae") in an aggregate total amount of approximately $27 million as of the Petition Date.

---

[3]     The RC LLCs consist of the following co-debtor subsidiaries of RC Sooner: RC Brixton Square Owner, LLC; RC Cedar Crest Owner, LLC; RC Fulton Plaza Owner, LLC; RC Magnolia Owner, LLC; RC Pomeroy Park Owner, LLC; RC Salida Owner, LLC; RC Savannah South Owner, LLC and RC Southern Hills Owner, LLC. RC Sooner is also the direct parent of non-filing entity RC Old South Owner, LLC, whose real estate assets are not subject to loans held by the Federal National Mortgage Association.

[4]     The Apartment LLCs consist of the following co-debtor indirect subsidiaries of RC Sooner: Brixton Square Apartments, LLC; CC Apartments, LLC; Fulton Plaza Apartments, LLC; Magnolia Manor Apartments, LLC; Pomeroy Park Apartments, LLC; Salida Apartments, LLC; Savannah South Apartments, LLC and Southern Hills Villa Apartments, LLC. RC Sooner is also the ultimate parent of non-filing entity Old South Apartments, LLC, whose loan is not held by the Federal National Mortgage Association.

## B. The Acquisition of the Debtors' Business

9.     Prior to October 29, 2009, the Apartment LLCs were owned by one or more related individuals and trust entities including Tim L. Remy, Tim J. Remy, Sherry E. Remy, L. Leon Remy, Robin E. Remy, Mona Remy Berke, the Sherry E. Remy Revocable Trust DTD July 14, 1997 and the L. Leon Remy Revocable Trust DTD July 14, 1997 (collectively, the "Remys") who held the Apartment LLCs through one or more holding companies (each, a "Remy Holding Company").

10.     In or around early October 2009, I commenced negotiations with the Remys through their general agent and real estate broker, William T. Strange ("Strange") and his firm Sperry Van Ness/William T. Strange Associates, Inc. ("SVN") for the purpose of evaluating a possible acquisition of the Apartments. As a result of these negotiations, RC Sooner was formed later that month in furtherance of the exploration of the potential acquisition.

11.     After a thorough review of the documents and information provided by the Remys and SVN, each of the RC LLCs was formed in the State of Oklahoma to enable the acquisition of the Apartment LLCs.

12.     On or about October 29, 2009, each of the RC LLCs closed their purchases of 100% of the membership units of the Apartment LLCs from the Remys by execution of several limited liability purchase agreements (collectively, the "Sale Agreements") executed between each RC LLC and the respective Remy Holding Company holding each of the Apartment LLCs. The total consideration paid for the purchase of the Apartment LLCs under the Sale Agreements was $29,772,661, which amount included the RC LLCs' assumption of

approximately $26,958,973.00[5] in Loans and Mortgages on the Apartments and an aggregate cash payment to the Remys, SVN and Strange of approximately $1,196,000.00.

## C.    Events Leading to the Commencement of the Chapter 11 Cases

13.    Unbeknownst to me, RC Sooner or the RC LLCs, the Remys and their brokers had engaged in a pattern of intentional misconduct and fraudulent misrepresentation from the very outset of negotiations for the sale of the Apartments and the Apartment LLCs.

14.    Since approximately September 2, 2009, prior to the commencement of sale negotiations, the Loans and Mortgages had been in default and remained in default as of the closing, in violation of the sellers' explicit representation and warranty in each of the Agreements that no such defaults existed. In fact, every one of the numerous representations and warranties made by the Remys in the Sale Agreements was false, known by the Remys and their brokers to be false at closing and during the negotiations the parties conducted concerning the proposed purchases and the Sale Agreements.

15.    Moreover, on or about November 19, 2009, twenty-one (21) days *after* the closing and after the RC LLCs had assumed and begun to perform all obligations under the Loans and Mortgages, certain of the Remys – without authorization either express or implied from the Apartment LLCs – secretly negotiated and wrongfully executed certain forbearance agreements (the "Forbearance Agreements") with Fannie Mae under which they acknowledged defaults under the Loans and Mortgages and purported to obligate the Apartment LLCs to make over $1.8 million in additional forbearance payments and increased monthly payments to Fannie Mae.

---

[5]    This figure does not include loans and mortgages in the amount of $1,622,688.00 that were assumed by non-filing entity RC Old South Owner, LLC on account of property held by non-filing entity Old South Apartments, LLC.

16.     The existence of the past defaults and the secret Forbearance Agreements ultimately came to light during the course of my own efforts to retain counsel to assist the Company in recovering over $200,000.00 in post-closing rental income that had been collected by a Remy-related entity acting as an agent for the Apartment LLCs.

17.     On or about January 21, 2010, I contacted attorney Dallas Ferguson ("Ferguson") of Doerner, Saunders, Daniel & Anderson, LLP and provided him with the background of the acquisition in the course of requesting his legal assistance in the recovery matter. However, I was informed by Ferguson that his firm could not represent me because they also represented Fannie Mae, and was subsequently contacted later that same day by Lewis N. Carter ("Carter") who serves as Fannie Mae's counsel in Tulsa. It was during the course of my conversation with Carter that he first learned of the acquisition of the Apartment LLCs. Shortly after my conversation with Carter, Fannie Mae declared a non-monetary default on account of the transfer of the ownership interests in the Apartment LLCs to the Company without Fannie Mae's consent.

18.     On or about January 29, 2010, David Herrold ("Herrold"), Oklahoma counsel to the Debtors contacted Carter to attempt to resolve certain issues concerning the defaults. At that time, Carter informed Herrold that Fannie Mae did not intend to waive its right to declare a default under the Loans and Mortgages by virtue of the transfer of the ownership interests in the Apartment LLCs to the Company, was not at that time willing to reinstate the Loans and declared that Fannie Mae was unwilling even to discuss resolution of the Loan and Mortgage defaults absent the Company's entry into pre-negotiation agreements for each of the Apartments which required, among other things, that the Company remit to each Loan servicer outstanding balances allegedly owed to Fannie Mae by the Remys.

19.     On February 2, 2010, only two business days after the January 29th communications between Herrold and Carter, Fannie Mae initiated state court actions in the Tulsa County District Court against four of the Apartment LLCs and certain of the Remys, seeking foreclosure and the appointment of a receiver. On February 8, 2010, additional foreclosure actions were filed against each of the remaining Apartment LLCs and certain of the Remys, with motions for the appointment of a receiver similarly being filed with respect to each Apartment LLC except for Pomeroy Park Apartments, LLC. Hearings for the appointment of a receiver with respect to all of the Apartment LLCs have now been scheduled for February 23, 2010.

## D.     Objectives of the Chapter 11 Filing

20.     Despite the Company's good faith attempts to resolve any defaults in the Loans and Mortgages directly with Fannie Mae on a consensual basis, Fannie Mae has indicated its intent to prosecute its state court actions against each of the Apartment LLCs, even after having been made aware of the serious misconduct by the Remys and their brokers in connection with the negotiation and execution of the Sale Agreements and the Forbearance Agreements. Importantly, the Debtors believe that, excluding payments due on account of the pre-petition Loans and Mortgages, they have sufficient operational liquidity to continue to operate their business in the ordinary course. However, in light of the impending state court actions, the Debtors believe that the filing of chapter 11 petitions is necessary in order to provide sufficient time for them to pursue claims against the Remys and their brokers, recover nearly $200,000 in post-acquisition rental income currently being withheld in a frozen Bank of the West account belonging to a Remy-related company, and negotiate a resolution of the Loan and Mortgage

defaults with Fannie Mae, all of which efforts will enable the Debtors to preserve and maximize the value of their business for the benefit of their creditors and other interested parties.

## II.      First Day Motions And Applications To Be Heard On An Expedited Basis

21.      The Debtors' successful operation under chapter 11 is dependent on the relief requested by the Debtors' First Day Motions and proposed orders submitted concurrently herewith. I have reviewed each of the First Day Motions and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Therefore, the Debtors request that orders be entered for the reasons set forth below and in the respective First Day Motions.

## A.      Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases

22.      On the Petition Date, through their Motion for an Order Directing the Joint Administration of Related Chapter 11 Cases (the "Motion for Joint Administration"), the Debtors seek entry of an order directing the joint administration of their chapter 11 cases and the consolidation thereof for procedural purposes only.

23.      The Debtors request that the caption of these chapter 11 cases be modified to reflect the joint administration of these cases. The use of a single caption, naming only RC Sooner Holdings, LLC, et al., will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

24.      In addition, the Debtors request that the Court authorize and direct that a notation be entered on the dockets of each of the Debtors' cases to reflect the joint administration of these cases. Finally, the Debtors request that the Court authorize that a combined service list be used for the jointly administered cases, and combined notices be sent to creditors of the Debtors' estates.

25.     All of the Debtors are affiliated entities and their financial affairs are closely related.  Joint administration of the Debtors' bankruptcy estates is warranted as it will reduce unnecessary administrative expenses and reduce the burden on the Court and interested parties.

26.     The Debtors' consolidated creditor matrices in these cases list approximately 700 potential creditors and parties in interest, nearly 600 of which are tenants in the Apartments.  The Debtors anticipate that notices, applications, motions, other pleadings and orders in these cases will affect many or all of the Debtors.  Joint administration will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the documents that will be filed and served in these cases.  Joint administration will also enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in all of these cases.  Otherwise, duplication of substantially identical documents would be necessary.  Such duplication would be extremely wasteful and would unnecessarily burden the Court, creditors, and parties in interest.

27.     Therefore, I believe that entry of an order granting the Motion for Joint Administration would be in the best interests of the Debtors, their estates and their creditors.

**B.     Motion for Order Authorizing Maintenance and Utilization of Cash Management System and Bank Accounts and Continued Use of Existing Business Forms**

28.     On the Petition Date, the Debtors request approval to (i) maintain their existing business forms and existing corporate bank accounts and cash management system and (ii) utilize their existing bank deposit accounts without the need for a bond or other collateral otherwise required by Bankruptcy Code section 345 pursuant to the Debtors' Motion for Order

Authorizing Maintenance and Utilization of Cash Management System and Bank Accounts and Continued Use of Existing Business Forms (the "Cash Management Motion").

29.     Before the commencement of their bankruptcy cases, the Debtors, in the ordinary course of business, used a cash management system to collect, transfer and disburse funds generated by their operations and to accurately record all such transactions as they were made. Under this cash management system, cash received from the Debtors' tenants is collected by the Debtors' property management company, RC Realty. All costs and expenses of the properties are paid from the tenant funds and the excess cash is forwarded to RC Sooner. A depiction of the Debtors' cash flow is attached as Exhibit A to the Cash Management Motion.

30.     The Debtors currently maintain two (2) active bank accounts (together, the "Bank Accounts"), which are identified in the Cash Management Motion. Each of the Bank Accounts is essential to the day-to-day operation of the Debtors' business, and together they play a critical role in the Debtors' existing cash management system, which has been in place since 2009. Both of the Debtors' Bank Accounts are in a financially stable banking institution.

31.     The Debtors request authority for RC Sooner to maintain and utilize its existing Bank Accounts and cash management system in accordance with its prepetition practices and procedures. These practices and procedures provide for an effective and economic utilization of funds by the Company and its business operations.

32.     Furthermore, it is my understanding that the Office of the United States Trustee has established certain guidelines (the "UST Guidelines") for the operation of debtors in possession that require chapter 11 debtors, among other things to: (i) close all existing bank accounts and open new bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate

debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts which bear the designation "Debtor In Possession," the bankruptcy case number, and the type of accounts.

33.     The Debtors seek a waiver of the U.S. Trustee's requirement that the Bank Accounts be closed and that new postpetition bank accounts be opened. The Bank Accounts are part of the Debtors' carefully-constructed cash management system and allow for the Debtors to fund ongoing operations in a streamlined and cost-efficient manner. In order to avoid delays in payments to administrative creditors and to ensure minimal disruption to operations and a smooth transition into chapter 11, it is critical that the Debtors be permitted to maintain their existing Bank Accounts.

34.     Permitting RC Sooner to maintain its Bank Accounts in their current form will assist in accomplishing a smooth and orderly transition into chapter 11, thereby creating a minimum amount of interference with continuing operations.[6]  Accordingly, the Debtors request that the Bank Accounts be maintained in the ordinary course of business, provided that no pre-petition checks, drafts, wire transfers, or other forms of tender which have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate order of this Court.

35.     Additionally, the Debtors, in the ordinary course of their business, use many invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors engage, and the numerous other parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or

---

[6]     After RC Sooner has exhausted its currently supply of checks, it will have new checks printed with the designation "DIP" or "Debtor in Possession."

change. A substantial amount of time and expense would be required in order to print new business forms. Accordingly, the Debtors request that they be authorized to continue to use their existing business forms.

36.     The Debtors submit that they should be granted further relief from the UST Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, it is my understanding that the UST Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.

37.     Considering the relative complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire or ACH payments and other similar methods. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their obligations and unnecessarily disrupt the operations as well as create additional costs.

38.     Finally, it is my understanding that a debtor's deposits are required to be invested in accordance with certain guidelines set forth under section 345 of the Bankruptcy Code. The Debtors do not maintain any investment accounts or investment funds nor do they invest any amounts in the Bank Accounts in overnight paper or money market accounts. In addition, on the Petition Date, none of the Debtors had in excess of $250,000 in the aggregate deposited in the Bank Accounts at the Bank and the average daily balances of the Bank Accounts are far less than $250,000. As such, the Debtors believe that all amounts in their Bank Accounts are insured (and will remain insured post-petition) by the Federal Deposit Insurance Corporation (the "FDIC"). Accordingly, the Debtors submit that the investment guidelines set forth under Bankruptcy Code section 345 are satisfied, or in the alternative should be waived.

39.    Therefore, I believe that entry of an order granting the Cash Management

Motion would be in the best interests of the Debtors, their estates and their creditors.

## C.    Motion for Interim and Final Orders Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Service, Deeming Utilities Adequately Assured of Future Payment, and Establishing Procedures for Determining Adequate Assurance of Payment

40.    On the Petition Date, the Debtors request entry of an order allowing the

continuance of their normal utility services pursuant to the Motion of the Debtors for Interim and

Final Orders Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers From

Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of

Future Payment, and (c) Establishing Procedures for Determining Adequate Assurance of

Payment (the "Utility Motion").

41.    In the ordinary course of business, the Debtors use gas, water, electric,

telecommunications and other services provided by various utility companies (collectively, the

"Utility Providers") at each of their Apartment locations in Tulsa, Oklahoma.  Rent paid by

tenants is inclusive of utility services.

42.    Continued and uninterrupted utility service is essential to the Debtors'

ability to sustain their operations during these chapter 11 cases.  Any interruption of utility

service would severely disrupt the Debtors' business operations.  Attached as Exhibit A to the

Utility Motion is a non-exhaustive list of the Utility Providers that provide utility services to the

Debtors as of the Petition Date.[7]  The Debtors estimate that their aggregate monthly payments to

their Utility Providers average approximately $90,000.00.

---

[7]       Neither the omission from, or inclusion in, Exhibit A to the Utility Motion is dispositive as to whether a particular party is or is not a utility company, but simply represents the Debtors' attempt to be conservative and inclusive as to the status of such party.  The Debtors reserve all rights to further address the

(continued...)

43. To provide adequate assurance of payment for future services to their Utility Providers, the Debtors propose to deposit a sum equal to approximately 50% of their estimated cost of monthly utility consumption, $45,000.00, into an interest-bearing, segregated account (the "Utility Deposit Account") within ten (10) days after the entry of an order granting the Utility Motion, with such Utility Deposit Account to be held in escrow, pending further order of the Court.

44. In addition, the Utility Motion contains detailed procedures that the Debtors seek to establish (the "Procedures") by which Utility Providers may request additional adequate assurance of future payment, in the event that a particular Utility Provider believes that the Utility Deposit Account does not provide it with satisfactory, adequate assurances.

45. Under the circumstances of these cases, the Debtors believe that the establishment of the Utility Deposit Account, relative to their estimated monthly consumption, and establishment of the Procedures, constitutes adequate assurance of payment under section 366(c) of the Bankruptcy Code. The Utility Providers should be further assured by the Debtors' ability to pay future utility bills from ongoing operations and the Utility Providers' entitlement to an administrative expense priority claim under section 503 of the Bankruptcy Code for any unpaid post-petition utility services.

46. Therefore, I believe that entry of an order granting the Utility Motion would be in the best interests of the Debtors, their estates and their creditors.

---

(...continued)

    characterization of any particular entities listed on Exhibit A as a utility company within the meaning of section 366(a) of the Bankruptcy Code. The relief requested in the Utility Motion is with respect to all Utility Providers and is not limited to only those identified in Exhibit A.

**D.** **Application for Employment of BMC Group, Inc. As Claims, Noticing, and Balloting Agent**

47.     On the Petition Date, the Debtors request approval to employ BMC Group, Inc. ("BMC") as their claims, noticing, and balloting agent pursuant to their Application for Entry of an Order (I) Authorizing the Employment and Retention of BMC Group, Inc. as Claims, Noticing and Balloting Agent for the Debtors and (II) Approving Form and Manner of Notice of Section 341 Meeting (the "Application to Employ Claims Agent").

48.     There are approximately 700 creditors in these cases. The number of creditors involved favors the utilization of an outside agent to perform various administrative services to alleviate the burden that such services otherwise would impose on the Clerk of this Court.

49.     Furthermore, District of Delaware Local Bankruptcy Rule 2002-1(f) requires debtors with more than 200 creditors to request authority from the Court to retain a claims and noticing agent to assist with such functions. The Debtors believe that the employment of BMC as proposed in the Application to Employ Claims Agent will (i) relieve the Clerk of significant administrative burdens, (ii) avoid delay in the management and processing of proofs of claim, and (iii) reduce expenses that would otherwise be incurred in connection with retrieving proof of claim copies from the Clerk and responding to numerous claim-related inquiries. In addition, the Debtors' management and professionals will coordinate responsibilities with BMC to avoid the unnecessary duplication of services.

50.     Based on BMC's experience in providing similar services in large chapter 11 cases, the Debtors believe that BMC is qualified to serve it in these chapter 11 cases and that

the retention of BMC as their Claims, Noticing and Balloting Agent is in the best interest of the Debtors' estates and creditors.

**E.    Motion for Interim Authority to Use Cash Collateral**

51.    On the Petition Date, the Debtors request Court approval to use cash collateral of the Debtors' prepetition secured lenders pursuant to the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors in Possession to Use Cash Collateral, (B) Granting Replacement Liens to Fannie Mae, (C) Granting Adequate Protection and (D) Scheduling a Final Hearing Thereon (the "Cash Collateral Motion").

52.    The Debtors do not have available sources of working capital and financing to carry on the operation of their business and administer these chapter 11 cases without using cash collateral. Accordingly, the purpose of the Cash Collateral Motion is to ensure that the Debtors have sufficient liquidity.

53.    It is critical to the Debtors' reorganization efforts that they be granted authority to use Cash Collateral. The Debtors require sufficient liquidity to satisfy their ongoing cash requirements to fund ordinary course expenditures, including, without limitation, utilities, taxes, property maintenance and other overhead expenditures. The failure to satisfy ordinary course obligations in a prompt and timely manner would result in immediate and irreparable injury to the Debtors' operations.

54.    The ability to use Cash Collateral will enable the Debtors to preserve and enhance the value of their business and assets for the benefit of all creditors and will provide the Debtors with the opportunity to preserve the value of the estates' assets and to develop and confirm a chapter 11 plan.

55. In the exercise of their business judgment, the Debtors have determined that they can operate post-petition in accordance with the administrative Budget annexed to the Cash Collateral Motion. Importantly, the Debtors believe that, excluding payments due on account of the Pre-Petition Indebtedness, they can operate cash positive during the post-petition period covered by the administrative Budget.

56. The proposed interim and final Cash Collateral Orders have been proposed in good faith and are fair and reasonable under the circumstances of these cases.

57. In sum, I believe that good and sufficient cause has been and will be shown for the approval of the proposed Cash Collateral Orders, which will not prejudice the interests of any creditor or interested party. Approval of the relief requested herein will afford the Debtors an opportunity to realize maximum value for their existing business and assets. Thus, entry of interim and final orders approving the proposed use of Cash Collateral is in the best interests of the Debtors, their estates, and their creditors.

### III. Additional Motions To Be Heard On Appropriate Notice

### A. Application to Employ Ballard Spahr LLP as Counsel for the Debtors

58. The Debtors seek to retain Ballard Spahr LLP ("Ballard Spahr") as of the Petition Date as bankruptcy counsel in their chapter 11 cases pursuant to the Application for an Order Authorizing the Retention and Employment of Ballard Spahr LLP as Counsel to the Debtors and Debtors in Possession Pursuant to 11 U.S.C. § 327(a), Fed.R.Bankr.P. 2014(a) and Del.Bankr.L.R. 2014-1 *Nunc Pro Tunc* to the Petition Date (the "Application to Employ Ballard Spahr").

59. The Debtors seek to retain Ballard Spahr as counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business

reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, Ballard Spahr has become familiar with the Debtors' business and affairs and the potential legal issues that may arise. Accordingly, the Debtors believe that Ballard Spahr is well qualified and uniquely able to represent them in an efficient and timely manner, and such retention will be cost effective for the Debtors' estates.

60. To the best of the knowledge of the Debtors, and except as disclosed in the Application to Employ Ballard Spahr and in the Declaration of Tobey M. Daluz attached thereto, Ballard Spahr is a "disinterested person" within the meaning of Bankruptcy Code section 101(14), does not represent or hold any interest adverse to the Debtors or their estates, and does not have any "connections" with any of the Debtors, their creditors, or any other party in interest, their respective attorneys and accountants, the United Sates Trustee, or any person employed in the office of the United States Trustee.

61. Therefore, I believe that entry of an order granting the Application to Employ Ballard Spahr would be in the best interests of the Debtors, their estates, and their creditors.

**B.** **Application to Employ Palmetto, Mollo, Molinaro, & Sciacca, LLC as Financial Accountants for the Debtors**

62. The Debtors seek to retain Palmetto, Mollo, Molinaro, & Sciacca, LLC ("Palmetto Mollo") as of the Petition Date as their accountants in their chapter 11 cases pursuant to the Application for an Order Authorizing the Retention and Employment of Palmetto, Mollo, Molinaro, & Sciacca, LLC as Accountants for the Debtors (the "Application to Employ Palmetto Mollo").

63.     The Debtors seek to retain Palmetto Mollo as accountants because of its considerable experience in providing accounting, consulting, tax, and financial advisory services in both bankruptcy and non-bankruptcy matters. The Debtors believe that Palmetto Mollo is well qualified to serve as the Debtors' accountants and that the retention of Palmetto Mollo as their accountants is essential to the Debtors' ability to comply with the requirements imposed upon debtors in possession under chapter 11 of the Bankruptcy Code and to reorganize successfully.

64.     To the best of the knowledge of the Debtors, and except as disclosed in the Application to Employ Palmetto Mollo and in the Verified Statement of Dean Mollo attached thereto, Palmetto Mollo is a "disinterested person" within the meaning of Bankruptcy Code section 101(14), does not represent or hold any interest adverse to the Debtors or their estates, and does not have any "connections" with any of the Debtors, their creditors, or any other party in interest, their respective attorneys and accountants, the United Sates Trustee, or any person employed in the office of the United States Trustee.

65.     Therefore, I believe that entry of an order granting the Application to Employ Palmetto Mollo would be in the best interests of the Debtors, their estates, and their creditors.

## C.     Motion for Order Establishing Interim Compensation and Reimbursement Procedures for Professionals

66.     The Debtors seek entry of an order approving procedures for interim compensation and reimbursement of expenses of professionals pursuant to their Motion for Administrative Order under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (the "Fee Procedures Motion").

67.     The Debtors request that the Court establish procedures for compensating and reimbursing Court-approved, retained professionals on a monthly basis. The requested procedures, which are detailed in the Fee Procedures Motion, would permit each retained professional subject to such procedures to present to the Debtors, the United States Trustee, and counsel to any official committee of unsecured creditors to serve in these chapter 11 cases, an application for interim approval and allowance of fees for services rendered and expenses incurred by each retained Professional during the immediately preceding month. In the event that none of the foregoing parties object to a monthly fee application, the Debtors would be authorized to pay the professional the lesser of (i) 80 percent of the fees and 100 percent of the expenses requested in the Monthly Fee Application (the "Maximum Payment") or (ii) 80 percent of the fees and 100 percent of the expenses not subject to an objection.

68.     Pursuant to the procedures more particularly described in the Fee Procedures Motion, beginning with the period ending on May 31, 2010, and at three month intervals or such other intervals convenient to the Court, each Professional would file and serve an interim application for allowance of compensation and reimbursement of expenses of the amounts sought in the Monthly Fee Applications filed during such period.

69.     The procedures outlined in the Fee Procedures Motion will relieve the burden on the Court imposed by alternative interim compensation procedures that require monthly court orders, while preserving all rights of objection, enabling the parties to closely monitor costs of administration, and enabling Professionals to maintain a level cash flow.

70.     Therefore, I believe that entry of an order granting the Fee Procedures Motion is in the best interests of the Debtors, their estates and their creditors.

Based upon the foregoing, the Debtors submit that the relief requested in each of the above-described motions and applications is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest, and should be granted.

Daniel Gordon, Sole Manager of
RC Sooner Holdings, LLC

Subscribed and sworn to before me
this 19th day of February, 2010

Notary Public

KIMBERLY A MATTERA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6175420
Qualified in New York County
My Commission Expires October 09, 2011

# EXHIBIT A

# RC SOONER HOLDINGS, LLC
## Corporate Structure



**RC Sooner Holdings, LLC**
(Delaware)
EIN: 27-1187904

**RC Brixton Square Owner, LLC**
(Oklahoma)
EIN: 27-1188002

**Brixton Square Apartments, LLC**
(Oklahoma)
EIN: 26-3451844

**RC Cedar Crest Owner, LLC**
(Oklahoma)
EIN: 27-1187914

**CC Apartments, LLC**
(Oklahoma)
EIN: 26-3451796

**RC Fulton Plaza Owner, LLC**
(Oklahoma)
EIN: 27-1188011

**Fulton Plaza Apartments, LLC**
(Oklahoma)
EIN: 26-2564344

**RC Magnolia Owner, LLC**
(Oklahoma)
EIN: 27-1187998

**Magnolia Manor Apartments, LLC**
(Oklahoma)
EIN: 26-2564486

**RC Ola South Owner, LLC**
(Oklahoma)
EIN: 27-1187971

**Ola South Apartments, LLC**
(Oklahoma)
EIN: 26-2563641

**RC Pomeroy Park Owner, LLC**
(Oklahoma)
EIN: 27-1187939

**Pomeroy Park Apartments, LLC**
(Oklahoma)
EIN: 26-3451649

**RC Salida Owner, LLC**
(Oklahoma)
EIN: 27-1187947

**Salida Apartments, LLC**
(Oklahoma)
EIN: 26-3451915

**RC Savannah South Owner, LLC**
(Oklahoma)
EIN: 27-1187983

**Savannah South Apartments, LLC**
(Oklahoma)
EIN: 26-2568586

**RC Southern Hills Owner, LLC**
(Oklahoma)
EIN: 27-1187958

**Southern Hills Villa Apartments, LLC**
(Oklahoma)
EIN: 26-3451721

RC Ola South Owner, LLC and Ola South Apartments, LLC are no longer a part of the Company's portfolio.